IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| LEGACY MEDICAL CONSULTANTS, LP, SUCCESSOR IN INTEREST TO LEGACY MEDICAL CONSULTANTS, LLC, | § § § § | |
| v. | § § | Civil Action No. 4:25-cv-00941-O |
| FOOT & ANKLE DOCTORS, INC., WENDY MOLINA, AND FARSHID NEJAD, | § § § | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

Defendants Foot & Ankle Doctors, Inc. ("FAD"), Wendy Molina ("Molina"), and Farshid Nejad ("Nejad") (collectively, "Defendants") file this reply in support of their motion to dismiss the above-captioned matter for lack of personal jurisdiction or, alternatively, for failure to state a claim against Molina and Nehad ("Motion"). Defendants respectfully show the Court as follows:

I. **Lack of Personal Jurisdiction**

A. **The Court Must Consider Only Defendants' Contacts with Texas, Not Legacy's.**

As explained at length in Defendants' Motion, Defendants are not subject to personal jurisdiction in Texas because they lack the requisite "minimum contacts" with Texas. *See* ECF 2 pp. 5-11. In response, Legacy argues that personal jurisdiction exists based almost entirely on its own relationship with Texas, not Defendants':

> . . . **Legacy's** employees in Fort Worth, Texas, generated order statements reflecting the terms of each purchase. **Legacy** then promptly packed and shipped the products identified on the order statement for delivery to Defendants [in California] using second-day delivery. **Legacy** also provided the shipment's delivery status information to Defendants. Then, on the day that the products were shipped, **Legacy** sent Defendants an invoice, per order, via email. At the end of each month, **Legacy** delivered to Defendants an email with a summary PDF document containing all of the prior month's invoices, which reflected all amounts Defendants owed Legacy for products ordered in the preceding month.

ECF 15, p. 3 (emphasis added). However, "[a] plaintiff cannot manufacture specific personal jurisdiction over a defendant by relying on the plaintiff's own conduct." *Shambaugh & Son, L.P. v. Steadfast Ins. Co.*, 91 F.4th 364, 375 (5th Cir. 2024).

Citing the *Command-Aire* case, Legacy insists its own actions in Texas are relevant to the jurisdictional analysis because courts "will give 'weighty consideration' to the place where the contract is performed." ECF 15 p. 6. However, the very next sentence of the *Command-Aire* opinion clarifies: "If, however, the forum plaintiff's decision to perform its contractual obligation within its own forum state is totally unilateral, it cannot be viewed as purposeful on the part of the nonresident and the weight necessarily is diminished." *Command-Aire Corp. v. Ontario Mech. Sales & Serv. Inc.*, 963 F.2d 90, 94 (5th Cir. 1992).

Courts routinely find that where a contract does not explicitly contemplate performance in Texas (as is the case here), the plaintiff's performance in Texas cannot serve as a contact upon which specific jurisdiction may be based. *See, e.g., Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 501 (5th Cir. 2022) (Fifth Circuit has "rejected the argument that states have personal jurisdiction over breach of contract cases where a nonresident enters into a contract with a known resident of the forum state, if it is reasonably foreseeable that the resident will perform a material part of its obligations in the forum state and thereby cause business activity in the forum state") (internal quotes and brackets omitted); *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 313 (5th Cir. 2007) (no specific jurisdiction where "Moncrief agreed to perform analysis, without any discussion of *where* it would be done," "[t]he contract was silent as to location," and, "[g]iven the nature of the work, there's no indication that the location of the performance mattered"); *Unnikrishnan v. IoT.nxt Americas USA, Inc.*, No. 4:22-CV-870, 2025 WL 2108746, at *7 (E.D. Tex. July 28, 2025) ("the offer letter did not require performance in Texas,

nor did it specify that Plaintiffs would work in this district"); *see also Dudek v. Donald C. & Eleanor J. Glanville Revocable Tr.*, 109 F. App'x 657, 659 (5th Cir. 2004) (no personal jurisdiction where "the sole contact between the non-resident defendant and the forum state is a contract that did not require performance, other than payment, by the defendant in the forum state"); *Hydrokinetics, Inc. v. Alaska Mech., Inc.*, 700 F.2d 1026, 1029 (5th Cir. 1983) ("Although it did agree to purchase goods which it knew were to be manufactured by Hydrokinetics in Texas, no performance by Alaska Mechanical was to take place in Texas, other than perhaps the payment for the goods. We do not believe that the unilateral activity of Hydrokinetics in Texas satisfies the requirement of contact between Alaska Mechanical and the state of Texas.").

Legacy's insinuation that Defendants reached into Texas to purposely conduct business in Texas is simply not accurate. The contracts at issue exist because Legacy "markets its products to doctors all over the country." ECF 15, p. 2; *see also* ECF 1 p. 22 ¶ 12.

In short, Legacy attempts to impute its own contacts with Texas onto Defendants by virtue of Defendants' contractual relationship with Legacy. However, Defendants' contacts with a *Texan* do not amount to contacts with *Texas*.

### B.  Defendants' Contacts Do Not Establish Jurisdiction.

Other than the choice-of-law clause, the kinds of contacts discussed by Legacy all exist in just about any sale of goods between a non-resident buyer and a resident seller. In the vast majority of such transactions, the seller will process orders in Texas, the seller will store and ship goods from Texas, the seller will send invoices from Texas, the buyer will send payments to a Texas bank account, and the seller will suffer any injury in Texas, all by virtue of the seller's location in Texas.

To treat the existence of a choice-of-law clause as tipping the scale in favor of personal jurisdiction would have the effect of transforming choice-of-law clauses into *de facto* forum-

selection clauses, which, in turn, would give resident sellers the benefit of a forum-selection clause when the non-resident only agreed to a choice-of-law provision.

    **C.    Defendants' Return of Goods to Legacy is Irrelevant.**

In addition to its heavy reliance on its own contacts with Texas, Legacy argues that Defendants should be subject to the Court's jurisdiction because Defendants returned unwanted goods to Legacy in Texas. *See, e.g.,* ECF 15, p. 9. That alleged contact is irrelevant. Because Defendants are not subject to general jurisdiction in Texas, *see* ECF 2 pp. 5-6, the relevant contacts are those from which Legacy's claims arise. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021); *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018) ("[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction."). Legacy's own pleadings demonstrate that Legacy's claims do not arise from Defendants' return of goods to Legacy.

According to Legacy, this lawsuit "arises out of Defendants' breach of contract by failing to pay at least $2,108,297.26 for products purchased from Legacy." ECF 1 p. 19 ¶ 1, p. 33 ¶¶ 95-96 (alleging "the principal balance owed by Defendants remains at least $2,108,297" and stating Legacy seeks damages in such amount). But Legacy's own Response distinguishes between (1) the goods for which Defendants allegedly did not pay <u>and from which its claims arise</u>, and (2) the goods that Defendants returned <u>and upon which Legacy attempts to base personal jurisdiction</u>. According to Legacy:

1. Defendants placed "orders totaling $3,185,812 in Legacy products;" ECF 15 p. 3;
2. "Defendants remitted almost $1 million in payments;" *id.* p. 4;
3. Defendants "returned over $200,000 worth of products to Legacy's Fort Worth headquarters;" *id.*; and
4. "Defendants remain delinquent on a liquidated balance of $2,108,297.26." *Id.*

Legacy does not seek payment for the "over $200,000 worth" of goods returned by Defendants.

Because specific jurisdiction can only exist where the claims "arise out of" the defendant's contacts with the forum state, Defendants' return of goods to Legacy is not relevant to the Court's analysis. *See Am. Bank, F.S.B. ex rel. Am. Premium Fin. v. Auto-Owners Mut. Fire & Cas. Ins. Co.*, No. 4:10-CV-331-A, 2010 WL 3784282, at *4 (N.D. Tex. Sept. 27, 2010) (McBryde, J.) (Defendant's return of a completed form to Plaintiff was not relevant to personal jurisdiction analysis because Plaintiff's claims did not "arise from the form"); *U.S. Rest. Props. Operating L.P. v. Aloha Petroleum, Ltd.*, No. 3:01-CV-0987-D, 2001 WL 1568762, at *3 (N.D. Tex. Dec. 5, 2001) (Fitzwater, J.) (meeting between the parties in Dallas was irrelevant where plaintiff did "not allege that its claim arises out of, or relates to" such meeting); *Clemons v. WPRJ, LLC*, 928 F. Supp. 2d 885, 903 (S.D. Tex. 2013) (Harmon, J.) (defendant's execution of promissory note in Texas was irrelevant where "litigation did not arise out of or relate to" such act).

For example, in a case arising from negligently calculated royalty payments, the Fifth Circuit held that other royalty payments were not relevant to the specific jurisdiction analysis. *See Libersat v. Sundance Energy, Inc.*, 978 F.3d 315, 317, 321 (5th Cir. 2020). Likewise, here Legacy's claims arise only from Defendants' alleged non-payment for certain goods, not from their return of other goods. Defendants' return of these other goods cannot serve as a contact in the jurisdictional analysis.

D.      **The *Stuart* Case is On-Point, Binding Authority.**

In their Motion, Defendants direct the Court to binding, on-point authority, the *Stuart* case. *See* ECF 2 p. 10. In *Stuart*, the defendant was a non-resident who engaged in the design, manufacture, and distribution of ski bindings. *See Stuart v. Spademan*, 772 F.2d 1185, 1187 (5th Cir. 1985). The plaintiffs, who were residents of Texas, ran a ski supply store that stocked the defendant's bindings. *See id.* at 1188. The plaintiffs determined that the defendant's bindings could

be modified to make it easier to fasten and release. *See id.* at 1187. The plaintiffs approached the defendant to solicit interest about the modification. *See id.* at 1188. To learn more about the modification, the defendant sent bindings to the plaintiff in Texas for modification. *See id.* The plaintiffs modified the bindings and sent them back to the defendant in Nevada. *See id.* The plaintiffs went on to file an application for a patent on the invention. *See id.* Later, the defendant sent a demonstration unit of the binding to the plaintiffs in Texas. *See id.*

Following negotiations by letter and telephone, the plaintiffs sold their patent to the defendant. *See id.* The assignment agreement provided that the plaintiffs "would assist in any further patent applications or for reissuance of the existing patent" and that the defendant would make payments to the plaintiffs in Texas. *See id.* Later, the parties executed an amendment to the assignment agreement, which required the defendant to make the payments "directly to the plaintiffs' bank accounts in Texas." *See id.* The amendment also substituted the following choice-of-law provision for that in the original agreement, which had provided for the application of California law: "All of the terms of this agreement as amended shall be subject to and shall be construed and enforced according to the laws of the state in which the aggrieved party under the terms of the contract is residing at the time such breach of contract or grievance occurs." *See id.* The plaintiffs executed both the assignment agreement and the amendment in Texas, while the defendant executed both in another state. *See id.*

Pursuant to the amended agreement's terms, the defendant "made eight annual payments" directly to the plaintiffs' bank accounts in Texas. *See id.* In the meantime, the defendant sought reissuance of the patent, and, to this end, the defendant's attorneys in California exchanged a "significant amount of correspondence and numerous telephone calls" with the plaintiffs in Texas. *See id.* After a few years of collaboration between the parties, the United States Patent and

Trademark Office declined to reissue the patent, and the defendant informed the plaintiffs that he intended to discontinue the payments under the agreement due to the failure of consideration. *See id.* The defendant did cease the payments. *See id.* The plaintiffs filed a breach of contract action in this Court, and the defendant filed a motion to dismiss for lack of personal jurisdiction, which the trial court granted. *See id.* at 1189.

On appeal, the Fifth Circuit held the defendant's contacts described above did not subject the defendant to personal jurisdiction in Texas. *See id.* at 1192.

First, the Court "stress[ed] that [the defendant's] contract with the Texas plaintiffs does not alone establish the sufficient minimum contacts with Texas." *Id.* at 1193.

Second, the Court found that "the shipment of articles to the forum state is insufficient to justify an exercise of in personam jurisdiction over the nonresident shipper." *Id.*

Third, the Court held that the pre- and post-contractual communications between the parties—which the Court elsewhere characterized as "numerous"—did not constitute purposeful availment upon which specific jurisdiction could be based. *See id.* at 1188, 1193-94.

Fourth, the Court held the defendant's contractually-required payments to a Texas bank account could "hardly be termed significant in terms of determining purposeful availment of the benefits of the forum state's laws." *Id.* at 1194.

Fifth, the Court held that, "even assuming that the choice-of-law provision facilitates interpretation and enforcement of the agreement in accordance with Texas law, the provision is certainly insufficient of itself to justify jurisdiction over [the defendant]." *Id.* at 1196. The Court continued, "Nor is it sufficient, when added to the other alleged contacts, to alter our holding that an inference of purposeful availment is not supported by the totality of the purported contacts between Spademan and Texas." *Id.*

The *Stuart* case directly addresses each of the kinds of contacts upon which Plaintiff relies. Like in this case, the nonresident defendant in *Stuart* entered a contract with Texas residents to purchase an asset—there, intellectual property, here medical goods—created in Texas. Like in this case, the defendant communicated with Texas residents from outside of Texas. Like in this case, the defendant executed the agreement from outside of Texas, while the plaintiffs executed it from within Texas. Like in this case, the defendant sent contractually-required payments from out-of-state to a bank account in Texas. Like in this case, the agreement in *Stuart* contained a choice-of-law provision in favor of Texas law (for the purposes of the Fifth Circuit's analysis). Like in this case, the defendant shipped items to Texas, although unlike in *Stuart*, the claims in this case do not arise from such items. Like in this case, the foregoing contacts did not confer personal jurisdiction.

Legacy argues that "*Stuart* is distinguishable because the agreement in *Stuart* 'did not contemplate a long-term relationship with the kinds of continuing obligations of wide-reaching contacts envisioned by the *Burger King* contract'" and that, "[i]nstead, the *Stuart* case involved the one-time purchase and shipment of two items; the contract also had a California choice-of-law provision, not Texas." ECF 15 p. 8. Legacy's argument comes up short.

First, Legacy mischaracterizes the parties' relationship in *Stuart*. That case did not involve, as Legacy contends, "the one-time purchase and shipment of two items." *Id.* Instead, the *Stuart* agreement involved the sale of intellectual property and required ongoing obligations by both parties: the Texas resident sellers were obligated to—and did—"assist in any further patent applications or for reissuance of the existing patent," and the nonresident buyer was obligated to—and did—make "**annual** payments" to the seller. *See Stuart*, 772 F.2d at 1188 (emphasis added). In fact, the agreement in *Stuart* contemplated a long-term relationship in more definite terms than the agreement at issue here. The *Stuart* agreement required "annual payments" and contemplated

the sellers providing services relating to "any further patent applications." *Id.* (emphasis added). In contrast, the agreements at bar simply permit, but do not require, Defendants to place future orders. *See* ECF 1 pp. 38-40, 42-44. And the parties' relationship in *Stuart* lasted multiple years, while the one here lasted mere months. *See* ECF 15 p. 3 (relationship lasted from February to September).

Second, the parties' relationship in this case is not like that in *Burger King*. In *Burger King*, a nonresident franchisee entered "a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida," the forum state, involving "long-term and exacting regulation of his business from Burger King's Miami headquarters." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 480 (1985). The Legacy agreements, like the *Stuart* agreement, do "not contemplate a long-term relationship with the kinds of continuing obligations and wide-reaching contacts envisioned by the *Burger King* contract." *Stuart*, 772 F.2d at 1194.

Third, Legacy mischaracterizes the choice-of-law provision in *Stuart*. Although the original contract contained a California choice-of-law clause, the amendment replaced that clause with one which required the application of "the laws of the state in which the aggrieved party…is residing at the time such breach of contract or grievance occurs." *Stuart*, 772 F.2d at 1188. Further, the Fifth Circuit treated the choice of law clause as though it called for the application of Texas law. *See id.* at 1196.

## II. Failure to State a Claim

Legacy argues it stated a claim against Drs. Nejad and Molina because "Drs. Nejad and Molina failed to disclose they were signing the Agreements as agents of Foot & Ankle." ECF 15 pp. 12-13. But, as Defendants addressed in their Motion, Drs. Nejad and Molina clearly <u>did</u>

disclose that they were signing on FAD's behalf because the Agreements themselves identified FAD as the party to the agreement with Legacy (and define "Customer" to mean FAD):

> This Purchase Agreement (the "Agreement") is entered into as of this 9 day of Feb, 20 24 (the "Effective Date") between Legacy Medical Consultants and
>
> Provider Name: Foot & Ankle Doctors, Inc.
> Office Address: 9100 Wilshire Blvd. Suite 280E
> Beverly Hills, CA 90212
>
> ("Customer").

> This Rebate Fulfillment Agreement (the "Agreement") is entered into as of this 01 day of April, 20 __ (the "Effective Date") between Legacy Medical Consultants and
>
> Provider Name: Foot & Ankle Doctors, Inc
> Office Address: 9100 Wilshire Blvd #280E
> Beverly Hills, CA 90212
>
> ("Customer").

ECF 1 pp. 38, 42; *see also* ECF 2 p. 12. Legacy does not address this evidence. Legacy's claims are against FAD, not its employees.

        Respectfully submitted,

        */s/ Jordan M. Parker*
        Jordan M. Parker
        State Bar No. 15491400
        jparker@canteyhanger.com
        Derek Carson
        State Bar No. 24085240
        dcarson@canteyhanger.com
        Michael Ackerman
        State Bar No. 24120454
        mackerman@canteyhanger.com

        CANTEY HANGER LLP
        Cantey Hanger Plaza
        600 West 6th Street, Suite 300
        Fort Worth, Texas 76102
        (817) 877-2800  Telephone
        (817) 877-2807  Facsimile

        **ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I certify that on October 22, 2025, a true and correct copy of the foregoing was served on counsel for all parties via CM/ECF filing.

        */s/ Michael Ackerman*
        Michael Ackerman