IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| LEGACY MEDICAL CONSULTANTS, LP, SUCCESSOR IN INTEREST TO LEGACY MEDICAL CONSULTANTS, LLC, <br><br> Plaintiff, <br> v. <br><br> FOOT & ANKLE DOCTORS, INC., <br><br> Defendant. | § § § § § § § § § § § | Case No. 4:25-CV-00941-O |

**<u>PLAINTIFF LEGACY MEDICAL CONSULTANTS, LP'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS AND BRIEF IN SUPPORT</u>**

**BLANK ROME LLP**

Gregory J. Moore
Texas Bar No. 24055999
Audrey F. Momanaee
Texas Bar No. 24055993; Fed Bar No. 724132
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 632-8613
Gregory.Moore@BlankRome.com
Audrey.Momanaee@BlankRome.com

-and-

Megan A. Altobelli (local counsel)
Texas Bar No. 24107116
200 Crescent Court, Suite 1000
Dallas, Texas 75201
(972) 850-1467 (M. Altobelli Direct)
Megan.Altobelli@BlankRome.com

**ATTORNEYS FOR PLAINTIFF**

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION .................................................................................................. 1

II.  Relevant Allegations and Factual Background..................................................... 3

    A.   Defendant Enters into Two Fully-Integrated, Written
    Agreements with Legacy to Purchase Human Tissue Grafts................................. 3

    B.   The Alleged Post-Contractual Representations and
    Legacy's Benefit Verification Assurance Program. ............................................. 6

    C.   Defendant Orders and Receives Millions of Dollars' Worth
    of Grafts ............................................................................................................ 7

III. Argument .............................................................................................................. 8

    A.   Standard of Review............................................................................................. 8

    B.   Defendant Wholly Fails to Allege Any Breach of Contract. ................................ 9

        1.   The Plain Language of the Fully-Integrated Contracts
        Says Nothing About Credit for Denied Claims. ........................................... 9

        2.   As a Threshold Matter, None of the
        Contemporaneous Extrinsic Documents Defendant
        Attempts to Rely on Support Its Claims. ..................................................... 11

        3.   In Any Case, Prior and Contemporaneous Extrinsic
        Evidence Cannot Alter a Fully-Integrated Contract. ................................... 11

        4.   The Statute of Frauds Also Forecloses Defendant's
        Reliance on Frustaci and Chasteen's Oral
        Representations. ........................................................................................ 13

        5.   Frustaci and Chasteen Lacked the Authority to
        Legally Bind Legacy. ................................................................................. 14

        6.   But Critically, Even Setting All the Foregoing Aside
        and Accepting Defendant's Version of the
        Agreements, Defendant Still Fails to Adequately
        Plead a Breach............................................................................................ 16

        7.   For Similar Reasons, Even If Legacy's Benefit
        Verification Assurance Program Created Any
        Enforceable Contractual Obligations, FAD Has Not
        Pleaded a Breach of That Program Either.................................................... 16

    C.   Defendant Also Fails to Adequately Allege Fraudulent
    Inducement......................................................................................................... 18

        1.   As a Preliminary Matter, Post-Contractual Statements
        Are Irrelevant to Defendant's Fraudulent Inducement
        Counterclaim.............................................................................................. 18

i

2.   Moreover, None of the Precontractual or Contemporaneous Writings Support Defendant's Fraudulent Inducement Counterclaim............................................................. 18

3.   Defendant Is Left With Just the Alleged Misrepresentations by Frustaci and Chasteen, but, Again, Defendant Fails to Plead Any Basis to Hold Legacy Liable for Frustaci and Chasteen's Statements. ...................................................................... 19

4.   In Any Case, Defendant Fails to Plausibly Plead Any False Statements........................................................................ 20

5.   Defendant's Fraudulent Inducement Claim Also Fails Because It May Not Justifiably Rely on Alleged Representations That Are Contrary to the Unambiguous Terms of The Agreements. ................................................... 21

6.   Defendant's Fraud Claims Are Also Barred by the Statute of Frauds. ....................................................................... 24

IV.   CONCLUSION................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armendariz v. Hudgens*,
618 S.W.3d 750 (Tex. App.—El Paso 2020)......................................................................14, 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................................9

*Bandera Drilling Co. v. Sledge Drilling Corp.*,
293 S.W.3d 867 (Tex. App.—Eastland 2009, no pet.)......................................................10, 12

*Baptist Mem. Hosp. Sys. v. Sampson*,
969 S.W.2d 945 (Tex. 1998)..................................................................................................19

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,
590 S.W.3d 471 (Tex. 2019)..............................................................................................12, 21

*Baylor Univ. v. Sonnichsen*,
221 S.W.3d 632, 637 (Tex. 2007).........................................................................................24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................................................9

*Breeden v. Weinberger*,
377 F. Supp. 734 (M.D. La. 1974)........................................................................................7

*CC&T Enters., LLC v. Texas 1031 Exch. Co.*,
673 S.W.3d 631 (Tex. App.—San Antonio 2023)................................................................12

*Cleere v. Blaylock*,
605 S.W.2d 294 (Tex. App.—Dallas 1980, no writ) .............................................................14

*Community Health Sys. Pro. Servs. Corp. v. Hansen*,
525 S.W.3d 671 (Tex. 2017)..................................................................................................14

*Copano Energy, LLC v. Bujnoch*,
593 S.W.3d 721 (Tex. 2020)..................................................................................................13

*David J. Sacks, P.C. v. Haden*,
266 S.W.3d 447 (Tex. 2008)..................................................................................................12

*Dracopoulas v. Rachal*,
411 S.W.2d 719, 721 (Tex. 1967).........................................................................................13

*Eagle Properties, Ltd. v. KPMG Marwick,*
   912 S.W.2d 825, 827 (Tex. App.-El Paso 1995, pet. denied)..................................................18

*Eureka Holdings Acquisitions, L.P. v. Marshall Apartments, LLC,*
   2023 WL 6563105 (Tex. App.—Austin Sept. 29, 2023, pet. denied) ....................................13

*Frye v. Anadarko Petro. Corp.,*
   953 F.3d 285 (5th Cir. 2019) ...................................................................................................9

*Ghosh v. Grover,*
   412 S.W.3d 749 (Tex. App.—Houston [14th Dist.] 2013, no pet.).........................................25

*Grimm v. Grimm,*
   864 S.W.2d 160 (Tex. App.—Houston [14th Dist.] 1993, no pet.).........................................17

*Haase v. Glazner,*
   62 S.W.3d 795 (Tex. 2001).....................................................................................................24

*IRA Res., Inc. v. Griego,*
   221 S.W.3d 592, 597 (Tex. 2007)...........................................................................................14

*JPMorgan Chase Bank, N.A. v. Orca Assets, G.P. LLC,*
   546 S.W.3d 648 (Tex. 2018).......................................................................................21, 22, 23

*Land Title Co. of Dallas v. F. M. Stigler, Inc.,*
   609 S.W.2d 754 (Tex. 1980)...................................................................................................20

*Marshall v. MarOpCo., Inc.,*
   714 S.W.3d 724 (Tex. App.—Houston [14th Dist.] 2025).....................................................21

*Miller v. CitiMortgage,*
   970 F. Supp. 2d 568 (N.D. Tex. 2013) ...................................................................................20

*New Century Financial, Inc. v. Olympic Credit Fund, Inc.,*
   487 Fed. App. 912, 915 (5th Cir. 2012)..................................................................................18

*Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.,*
   574 S.W.3d 882 (Tex. 2019).....................................................................................................9

*Protect Envtl. Servs., Inc. v. Norco Corp.,*
   403 S.W.3d 532, 540 (Tex. App.-El Paso 2013, pet. denied)...........................................14, 15

*Roxo Energy Co. v. Baxsto, LLC,*
   713 S.W.3d 404 (Tex. 2025).......................................................................................21, 22, 23

*Sanders Oil & Gas GP, LLC v. Ridgeway Elec.,*
   479 S.W.3d 293, 301 (Tex. App.-El Paso 2015, no pet.) ..................................................14, 15

iv

*Union Pacific R.R. v. Novus Int'l, Inc.*,
   113 S.W.3d 418 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).......................................9

*United Residential Props., L.P. v. Theis*,
   378 S.W.3d 552 (Tex. App.—Houston [14th Dist.] 2012).......................................................19

*Universal C.I.T. Credit Corp. v. Daniel*,
   243 S.W.2d 154, 157 (Tex. 1951)............................................................................................12

*Walker v. Beaumont Indep. Sch. Dist.*,
   938 F.3d 724 (5th Cir. 2019) ....................................................................................................4

*Walker v. Tafralian*,
   107 S.W.3d 665 (Tex. App.—Fort Worth 2003)......................................................................13

**Statutes**

42 U.S.C.
   § 1395 *et seq.* .............................................................................................................................7
   § 1395y(a)(1)(A)...........................................................................................................................7

Social Security Act ...........................................................................................................................7

Tex. Bus. & Com. Code Ann.
   § 2.201......................................................................................................................................13
   § 2.202......................................................................................................................................12

**Other Authorities**

42 C.F.R. § 424.32(a)(1)(ii)............................................................................................................8

Fed. R. Civ. P.
   9(b)............................................................................................................................................20
   12(b)(6) ..................................................................................................................................8, 9

## I.    INTRODUCTION

On February 9, 2024, and then on April 1, 2024, Defendant Foot and Ankle Doctors, Inc. ("Defendant") signed two written agreements with Legacy Medical Consultants, LP ("Legacy") for the purchase of human tissue grafts. Both contracts were short and simple. They set prices for the grafts Defendant could order from Legacy, required Defendant to pay within sixty days of shipment, and made clear that Defendant's treating providers—not Legacy—bore sole responsibility for deciding how and when to use the grafts.

Consistent with the fact that Defendant had sole discretion over how to use the grafts, the agreements contain no promise that the grafts would be reimbursed by Medicare. Nor do they contain any promise that Legacy would give Defendant "a credit for any amounts not paid by Medicare in the event of a denial or underpayment[.]" And they expressly state that they "contain[ed] the entire agreement between the Parties concerning the subject matter hereof" and "could be amended or modified only by a written agreement signed by both parties." Defendant ordered and received millions of dollars' worth of grafts pursuant to those agreements. There is no allegation that a single graft was defective, failed to arrive, or did not work to treat Defendant's patients. To the contrary, Defendant admits that it benefited from the grafts it received from Legacy. Defendant also admits that it has refused to pay for no less than $2,108,297.26 worth of grafts it ordered, received, used, and benefited from.

Rather than paying, however, Defendant now brazenly brings counterclaims, alleging that *Legacy* breached the agreements by not waiving Defendant's obligation to pay. Specifically, Defendant alleges that, prior to entering into the agreements, third-party marketers (not Legacy employees) told it that "Legacy's practice was to verify insurance or Medicare coverage for its products and then, in the event the customer purchased products in reliance on this verification, Legacy would give the customer a credit for any amounts not paid by Medicare in the event of a

1

denial or underpayment (unless the denial or underpayment was due to the provider's use of a product that was not medically necessary)". Notwithstanding the fact that the actual form agreements Defendant signed made no such promise and notwithstanding the fact that the other contemporaneous documents Defendant received *expressly disclaimed* any "guarantee of coverage or reimbursement" and any "liability" on Legacy's part "for payment of any claims, benefits or costs," Defendant alleged that it entered into the agreements based on the third-party's representations to the contrary. Defendant further claims that—to the extent that the agreements did not actually guarantee a credit (and they did not)—Legacy fraudulently induced it into entering into the agreements through the third-party's false promise of a credit. Defendant's counterclaims are baseless and must be dismissed as a matter of law.

With respect to Defendant's contract claim, the alleged promise that Legacy would give Defendant a credit is, again, *nowhere* in the parties' fully-integrated written agreements or even in the contemporaneous writings Defendant received (which actually make clear that no such promise exists). Instead, Defendant must rely on contemporaneous oral representations by third-party marketers, but those representations *cannot* legally modify the parties' agreement under either the parol evidence rule or under the Statute of Frauds. Moreover, Defendant fails to plead that the third-party marketers who made the alleged promise had actual or apparent authority to speak for Legacy. Perhaps most fundamentally though—even if the third-party marketer's oral representations created binding contract obligations on Legacy—Defendant still has not alleged any breach of those obligations! Defendant alleges that it was told that "Legacy would give the customer a credit for any amounts not paid by Medicare in the event of a denial or underpayment (*unless the denial or underpayment was due to the provider's use of a product that was not medically necessary*)"—but Defendant never alleges that any denial or underpayment not credited

2

was not due to its own improper use of the product. For similar reasons, Defendant's attempted reliance on Legacy's Benefit Verification Assurance Program—a discretionary program for Legacy customers that Defendant received information about *after* entering into the agreements—is futile. That Assurance Program is expressly limited to denials "due **solely** to an error made by" Legacy and is "subject to" a number of "eligibility criteria and conditions/limitations of the Program," but Defendant fails to plead that it ever satisfied these "criteria and conditions/limitations" or that any denials were "due **solely** to an error" made by Legacy.

Defendant's fraudulent inducement counterclaim is equally unavailing. Again, neither the contracts nor the contemporaneous writings "promise" anything about a credit for non-reimbursed grafts. Instead, Defendant again relies solely on the alleged representations of third-party marketers, but Defendant fails to plead any basis to hold Legacy responsible for their representations. And as already explained, even if there were a promise to credit Defendant for grafts that were not reimbursed—so long as Defendant used the grafts properly—Defendant fails to allege a breach of that promise because it never alleges that it used the grafts properly. Defendant also cannot plead any justifiable reliance because it cannot, as a matter of law, justifiably rely on alleged representations that are contradicted by the unambiguous terms of the agreements.

For all of these reasons and those set forth below, the Court should grant Legacy's Motion to Dismiss and dismiss Defendant's counterclaims with prejudice.

## II.   RELEVANT ALLEGATIONS AND FACTUAL BACKGROUND

### A.   Defendant Enters into Two Fully-Integrated, Written Agreements with Legacy to Purchase Human Tissue Grafts.

Defendant alleges that, in early February 2024, a third-party marketer called Advanced Medical Administration ("AMA") contacted Defendant to sell Legacy's Impax Membrane skin graft products ("Impax"). Def.'s Counterclaims (ECF 25) (the "Counterclaims") ¶ 7. Defendant

had conversations with two individuals in particular, Joe Frustaci ("Frustaci") and Roger Chasteen ("Chasteen"), who Defendant knew were the senior account manager and CEO at AMA, respectively—not Legacy employees. *Id.* ¶ 8. Frustaci and Chasteen allegedly told Defendant that:

> Legacy's practice was to verify insurance or Medicare coverage for its products and then, in the event the customer purchased products in reliance on this verification, Legacy would give the customer a credit for any amounts not paid by Medicare in the event of a denial or underpayment (unless the denial or underpayment was due to the provider's use of a product that was not medically necessary).

*Id.* ¶ 9. Thereafter, on February 5, 2024, Chasteen sent Dr. Farshid Nejad, a medical provider at Defendant, an email with a number of onboarding documents. The email and attachments are attached hereto as Exhibit A.[1] Specifically, the email attached (1) Legacy's Patient Insurance Verification and Prior Authorization Request Form (the "IVR"), (2) an order form for Impax, (3) a blank Customer Onboarding Document and Purchase Agreement, (4) two case studies depicting wounds treated with Impax, (5) a guide to setting up an account with Legacy and submitting an IVR, and (6) a 2024 reimbursement guide from the manufacturer for Impax. *See id.* **None** of the documents sent to Defendant carried any promise or guarantee of reimbursement or credit from Legacy. *See generally* Ex. A. For example, the onboarding document attached to the email merely solicits basic customer information, such as the name of the provider and practice and contact information, *etc.* The IVR comes with a disclaimer that explicitly states "Legacy Medical offers insurance verification as an information service only. Information gathered during the requested research will be provided by the insurer or third-party payer. Results of this research are not a guarantee of coverage or reimbursement in the future. Legacy Medical disclaims liability for

---

[1] The Court can consider these documents because they are expressly incorporated and relied on in Defendant's Counterclaims. *See, e.g.*, Counterclaims ¶ 12; *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) ("When a defendant attaches documents to its motion that are referred to in the complaint and are central to the plaintiff's claims, the court may also properly consider those documents.")

payment of any claims, benefits, or costs." Ex. A at App. 004. And the 2024 Impax "Reimbursement Guide" from the manufacturer Stability Biologics makes clear that it is only for educational purposes and that it provides no guarantee of coverage or reimbursement fees. Ex. A at App. 036 (including "Reimbursement Disclaimer" stating that "[t]his information is for educational/informational purposes only and should not be construed as authoritative…. It is important to remember that while a code may exist describing certain procedures and/or technologies, it does not guarantee payment by payors.").

After receiving documents explicitly stating there is no guarantee of coverage or reimbursement, Defendant executed a two-page Purchase Agreement for Impax grafts ("Impax Agreement") on February 9, 2024. Counterclaims ¶ 13. Subsequently, on April 1, 2024, Defendant executed a second agreement—a two-page Fulfillment/Rebate agreement for SurGraft Membrane grafts ("SurGraft Agreement"). The Impax and SurGraft Agreements (collectively, the "Agreements") are attached as Exhibits A and B to the Original Petition.

Both Agreements were short and straightforward: They set prices for the grafts Defendant could order. *See* Agreements, Schedule A. After Defendant placed an order, Legacy would promptly ship the grafts. *See id.* ¶ 3. Then, at the end of each month, Legacy would send an invoice "that identifies the Products ordered in the preceding month and the Customer's outstanding balance," and Defendant "agree[d] to pay Legacy Medical Consultants the balance due amount stated in each Invoice within sixty (60) days after product shipment." *See id.* ¶ 6.

The Agreements contained no instructions or limitations on how Defendant could use the grafts. Instead, the parties expressly agreed, consistent with Medicare regulations, "that use of any Product is at the sole discretion of the treating provider, pursuant to his or her professional medical judgment." *Id.* ¶ 4. And consistent with the fact that Defendant could use the grafts as it deemed

5

medically appropriate, the Agreements contain no promises or representations about whether insurance or Medicare would cover the grafts. Nor do they contain any promises or representations that Defendant would be relieved of its obligation to pay for the grafts it ordered if insurance or Medicare ultimately declined to reimburse the grafts. The only thing that the Agreements require with respect to insurance or Medicare is that, to the extent that Defendant billed insurance or Medicare, it accurately "report[s] all amounts paid and rebates earned" to comply with the Anti-Kickback Statute (and any other applicable laws or agreements). *Id.* ¶ 5. And the Agreements include an express integration clause, making clear that "[t]his Agreement contains the entire agreement between the Parties concerning the subject matter hereof" and that it "may be amended or modified only by a written agreement signed by both parties." *Id.* ¶ 7.

**B.    The Alleged Post-Contractual Representations and Legacy's Benefit Verification Assurance Program.**

Defendant alleges that on April 12, 2024—*after* it had entered into the Agreements—Frustaci and Alex Poulemanos ("Poulemanos"), Legacy's Director of National Contracts, went to Defendant's Beverly Hills office and "discussed Legacy's billing practices and procedures and insurance-verification services related to the SurGraft products …" Counterclaims ¶ 16. Notably, this is the *only* allegation of any statement by a Legacy employee.

Thereafter, on April 18, 2024, Poulemanos provided Defendant with a written summary of Legacy's "Benefit Verification Assurance Program" (the "Assurance Program") attached hereto as Exhibit B. Defendant claims this summary indicates "Legacy promised it would credit providers for their actual costs stemming from a denial of coverage by Medicare for products that Legacy had verified as covered by Medicare." *Id.* at ¶ 17. However, as the document clearly reflects, the Assurance Program was a program that Legacy customers could separately and optionally enroll in. *See* Ex. B at App. 056 ("Program Enrollment"). And critically, it nowhere says that Legacy

6

would credit every denial of coverage. To the contrary, it says that it would only credit denials "due **solely** to an error made by Reimbursement Support Center in researching and summarizing whether and under what circumstances and criteria (*e.g.*, prior authorization, FDA-approved use, etc.) the product is covered by the patient's insurance" and "subject to" a number of "eligibility criteria and conditions/limitations of the Program—namely that the Provider must have used the Reimbursement Support Center prior to use of the product on the patient, provided complete and accurate patient information on the IVR for each date of service, obtained verification of patient benefits if required by the patient's insurance, used Legacy products in compliance with patient's insurance and documentation criteria, and notified the Reimbursement Support Center of any denials of coverage within six months and provide all related documentation." *See* Ex. B at App. 056–57.

C.      **Defendant Orders and Receives Millions of Dollars' Worth of Grafts**

Between February 9, 2024, and September 12, 2024, Defendant ordered and received millions of dollars' worth of grafts from Legacy pursuant to the Agreements, and Defendant submitted claims for some of the grafts it used to Medicare for reimbursement. *See* Counterclaims ¶ 29. By way of background, Medicare Part B covers non-institutional medical items and services, including items sold to physicians by suppliers (like skin grafts), if they are "reasonable and necessary" for the treatment of illness or injury. *See, e.g.*, 42 U.S.C. § 1395y(a)(1)(A); *see generally* 42 U.S.C. § 1395 *et seq.* Medicare assigns the nondelegable duty to determine whether a service or product is "reasonable and necessary" and whether it complies with all relevant Medicare rules and regulations to the treating physician—not a supplier. *See, e.g.*, *Breeden v. Weinberger*, 377 F. Supp. 734, 737 (M.D. La. 1974) ("[U]nder the Medicare provisions of the Social Security Act, Congress intended that the responsibility for determining what services the patient requires rests primarily with the treating physician."). Consistent with this framework, the

7

treating physician is the one to determine the appropriate use for the products before submitting their claims to Medicare and must certify that each claim complies with all applicable Medicare rules and to medical necessity in a form called a "CMS-1500." 42 C.F.R. § 424.32(a)(1) (requiring a doctor to file a form CMS – 1500 to request payment for medical services).

Here, Defendant has alleged nothing about how it has used or billed the grafts—*e.g.*, whether it has used the grafts for purposes and under circumstances that Medicare has indicated are eligible for reimbursement, whether it has properly documented and correctly billed Medicare, *etc*. Nor has Defendant alleged that it complied with any of the conditions of the Assurance Program—*e.g.*, whether it "used the Reimbursement Support Center prior to use of the product," whether it "provided the Reimbursement Support Center complete and accurate patient information," whether its use of Legacy products was "fully compliant with all of the patient's insurance and documentation criteria," *etc*. Although Defendant alleges that at least some of the claims it submitted were rejected by Medicare, Defendant pleads nothing about why Medicare denied the claims—something that would have been explained by Medicare in each claim denial. Thus, Defendant fails to plead whether any denial was "due to [its own] use of a product that was not medically necessary," Counterclaims ¶ 9, due to its own failure to be "fully compliant with all of the patient's insurance and documentation criteria," or "due **solely** to an error made by [Legacy's] Reimbursement Support Center," Ex. B at App. 056. Defendant also does not allege whether it timely notified Legacy of any "denial of coverage" as required by the Assurance Program, *see Id.*, nor does it allege whether it appealed any denials and the outcomes.

## III.    ARGUMENT

### A.    Standard of Review.

Rule 12(b)(6) of the Federal Rules of Civil Procedure governs motions to dismiss. To survive such a motion, claims must contain sufficient factual matter, accepted as true, to "state a

claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating a Rule 12(b)(6) motion to dismiss, the Court must accept all well-pleaded factual allegations as true and draw reasonable inferences in favor of the non-moving party. However, the Court is not required to accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Frye v. Anadarko Petro. Corp.*, 953 F.3d 285, 293 (5th Cir. 2019). Bare recitals of the elements of a cause of action, supported by mere conclusory statements, are insufficient to withstand dismissal. *Iqbal*, 556 U.S. at 678.

**B.      Defendant Wholly Fails to Allege Any Breach of Contract.**

**1.      The Plain Language of the Fully-Integrated Contracts Says Nothing About Credit for Denied Claims.**

Defendant claims that Legacy breached the Agreements by "refusing to credit FAD for costs resulting from Medicare denials and underpayments on products that Legacy had verified as covered." Counterclaims ¶ 26. Defendant's claim fails because it is based on alleged terms that simply do not exist. Under Texas law, "[a] contract's plain language controls, not what one side or the other alleges they intended to say but did not." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019); *see Union Pacific R.R. v. Novus Int'l, Inc.*, 113 S.W.3d 418, 421 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("We glean intent from what the parties said in their contract, not what they allegedly meant."). The starting point in any contract analysis is the plain language of the Agreements, and both the Agreements say absolutely ***nothing*** about any obligation on Legacy's part to issue credits for Medicare denials or underpayments.

To the contrary, the Agreements set forth clear and unconditional payment obligations: they expressly require payment "within sixty (60) days after product shipment," with no

contingency whatsoever for reimbursement by Medicare (or any other payor). Agreements ¶ 6. There is no clause providing for a credit "in the event of a [Medicare] denial or underpayment." There is no clause conditioning Defendant's payment obligations on Medicare reimbursement. Nor does it make any sense for there to be such a clause. As the Agreements also make clear, the "use of any Product is at the sole discretion of the treating provider, pursuant to his or her professional medical judgment." Agreements ¶ 4. Thus, Defendant could use the grafts in any way it wanted—including in ways that might not be reimbursable by Medicare. In that case, it makes no sense that Defendant would be absolved of its obligation to pay for the grafts. Indeed, under Defendant's theory, the more unreasonable—and less reimbursable—Defendant's use of the grafts is, the less likely Legacy is to get paid.

Recognizing that the written Agreements do not support its claims, Defendant claims that the Agreements were "not fully integrated" but, rather, that their "terms were informed and supplemented by other documents and communications, including Legacy's insurance verification forms, customer onboarding documents, orders, and the representations from Legacy concerning billing practices and Medicare reimbursement." Counterclaims ¶15. However, Defendant's conclusory claim that the Agreements were "not fully integrated" cannot overcome the plain language of the contracts, which both contain express integration clauses stating that they "contain[] the entire agreement between the Parties concerning the subject matter hereof … and may be amended or modified only by a written agreement signed by both parties." *See* Agreements ¶ 7; *see, e.g.*, *Bandera Drilling Co. v. Sledge Drilling Corp.*, 293 S.W.3d 867, 871 (Tex. App.—Eastland 2009, no pet.) ("When a contract contains a merger or integration clause, the contract's execution presumes that all prior negotiations and agreements relating to the transaction have been merged into the contract, and it will be enforced as written and cannot be added to, varied, or

10

contradicted by parol evidence.") (citation omitted).  And thus, because the Agreements were plainly fully-integrated, the "other documents and communications" Defendant tries to rely on to create additional contract obligations that Legacy allegedly breached are exactly the sort of extrinsic parol evidence that is legally barred from consideration.

### 2.    As a Threshold Matter, None of the Contemporaneous Extrinsic Documents Defendant Attempts to Rely on Support Its Claims.

As a threshold matter, none of the prior or contemporaneous extrinsic documents Defendant attempts to rely on actually supports its claims. Defendant identifies three categories of documents that it claims "supplemented" the Contracts: (1) Legacy's Insurance Verification Request forms ("IVRs"), (2) customer onboarding documents, and (3) orders. Counterclaims ¶¶ 13, 15. However, the Court can see for itself that not one of these documents contains anything close to a promise that Legacy would extend a credit to Defendant for any Medicare denials or underpayments or that Defendant would be absolved of its obligation to pay for any grafts that Medicare did not fully cover. *See generally* Ex. A. To the contrary, these "supplemental" documents just confirm that there *was no such promise*. For example, the Insurance Verification Request form comes with an express disclaimer that "Legacy Medical offers insurance verification as an information service *only*. Information gathered during the requested research will be provided by the insurer or third-party payer. Results of this research are not a guarantee of coverage or reimbursement in the future. Legacy Medical *disclaims liability for payment of any claims, benefits, or costs*." Exhibit A at App. 004 (emphasis added).

### 3.    In Any Case, Prior and Contemporaneous Extrinsic Evidence Cannot Alter a Fully-Integrated Contract.

Even setting aside the fact that the contemporaneous documents sent with the Agreements wholly fail to support Defendant's claims—none of the prior or contemporaneous evidence extrinsic to the Agreements can be considered anyway under the parol evidence rule. "The parol

11

evidence rule bars consideration of evidence that contradicts, varies, or adds to the terms of an unambiguous written agreement." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 483 (Tex. 2019); *see, e.g.*, *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) ("An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports.") (citing *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951)); *CC&T Enters., LLC v. Texas 1031 Exch. Co.*, 673 S.W.3d 631, 642 (Tex. App.—San Antonio 2023, no pet.). This rule applies with even greater force where—as in this case—the relevant agreements include an integration clause and an express no oral modification requirement. *See* Agreements ¶ 7; *see, e.g.*, *Bandera*, 293 S.W.3d at 871; *see also* Tex. Bus. & Com. Code § 2.202 ("Terms … set forth in a writing intended by the parties as a final expression of any agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement[.]"); *id.* § 2.209(b) ("A signed agreement which excludes modification … except by a signed writing cannot be otherwise modified[.]").

Here, the contemporaneous "documents and communications"—including, most notably, the alleged oral promises from Frustaci and Chasteen regarding credits and assurances for Medicare denials or underpayments—are classic parol evidence, *i.e.*, prior and contemporaneous statements outside of the contract that purport to add a material term that is entirely absent from the four corners of the integrated Agreements.[2] Counterclaims ¶¶ 9, 13, 15. Texas law could not be clearer on the point that such parol evidence is legally insufficient to alter the plain language of

---

[2] Poulemanos's post-contractual statements and Legacy's Assurance Program are separately addressed below. *See infra* Section III.B.7.

the Agreements, which nowhere include any promises about credits or assurance in the case of Medicare denials or underpayments.

####    4.    The Statute of Frauds Also Forecloses Defendant's Reliance on Frustaci and Chasteen's Oral Representations.

Even if the Court were to ignore the parol evidence rule, the Statute of Frauds would independently preclude Defendant's breach of contract counterclaims. Because any agreement between the parties for grafts would necessarily be a "contract for the sale of goods for the price of $500 or more," Tex. Bus. & Com. Code Ann. § 2.201,[3] the Statute of Frauds requires a "written memorandum that contains the essential terms of the contract, expressed with such certainty that they may be understood without resorting to oral testimony. Otherwise, the agreement is not enforceable." *Walker v. Tafralian*, 107 S.W.3d 665, 668 (Tex. App.—Fort Worth 2003, no pet.); *see, e.g.*, *Copano Energy, LLC v. Bujnoch*, 593 S.W.3d 721, 731 (Tex. 2020) (same). "[I]f a contract falls within the statute of frauds, a party cannot enforce any subsequent oral modification to the contract." *Eureka Holdings Acquisitions, L.P. v. Marshall Apartments, LLC*, 2023 WL 6563105, at *7 (Tex. App.—Austin Sept. 29, 2023, pet. denied) (citing *Dracopoulas v. Rachal*, 411 S.W.2d 719, 721 (Tex. 1967)).

Here, as already explained, none of the contemporaneous documentation says anything about a promise that Legacy would extend a credit for any grafts that Medicare failed to reimburse or under-reimbursed. *See supra* Section III.B.2. Thus, all that Defendant is left with is the ***oral*** representations from Frustaci and Chasteen that "Legacy would give the customer a credit for any amounts not paid by Medicare in the event of a denial or underpayment"—a purported additional, very material term that was never reduced to a writing (and is certainly nowhere in the written

---

[3] The ***cheapest*** graft available to purchase pursuant to the Agreements was $2,810.28. *See* Schedule A to Agreements.

13

Agreements).[4] Counterclaims ¶ 9. Accordingly, any such term—and any purported agreement containing such term—fails to comply with the Statute of Frauds and is, therefore, unenforceable.

**5.    Frustaci and Chasteen Lacked the Authority to Legally Bind Legacy.**

Moreover, because Defendant's breach of contract counterclaim depends on alleged oral representations by Frustaci and Chasteen—employees of a third-party marketer called AMA and not of Legacy—Defendant must plausibly plead that they had actual or apparent authority to bind Legacy to their representations. Defendant fails to do so.

Under Texas law, a principal is only liable for the acts of its agent if the agent has actual or apparent authority to do those acts. *See, e.g.*, *Armendariz v. Hudgens*, 618 S.W.3d 750, 759 (Tex. App.—El Paso 2020, no pet.) (citing *Sanders Oil & Gas GP, LLC v. Ridgeway Elec.*, 479 S.W.3d 293, 301 (Tex. App.—El Paso 2015, no pet.)). Absent either actual or apparent authority, a purported agent cannot bind a principal. *See, e.g.*, *id.* (citing *Protect Envtl. Servs., Inc. v. Norco Corp.*, 403 S.W.3d 532, 540 (Tex. App.—El Paso 2013, pet. denied)). Texas courts do not presume agency. *Community Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 697 (Tex. 2017) (citing *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007)). "In fact, the one relying on the authority of an agent is generally required to plead the facts relating to that contention." *Cleere v. Blaylock*, 605 S.W.2d 294, 295 (Tex. App.—Dallas 1980, no writ).

For there to be actual authority, the purported principal, through its "written or spoken words or [its] conduct," must have either (1) intentionally conferred the relevant authority or (2) intentionally, or by want of due care, allowed the agent to believe that he possessed the relevant authority. *Armendariz*, 618 S.W.3d at 759 (citing *Sanders*, 479 S.W.3d at 301-02). In the absence of actual authority, apparent authority still "may arise when a principal intentionally or negligently

---

[4] *See supra* fn. 3; *infra* Section III.B.7.

induces parties to believe that a person is the principal's agent although the principal has not conferred any actual authority on that person." *Id.* at 761 (citing *Protect Envtl. Servs.*, 403 S.W.3d at 541).

In both cases, however, only the principal's words and conduct are relevant—representations by the purported agent and the third party are not relevant in determining whether the agent had the relevant authority. *See, e.g.*, *Armendariz*, 618 S.W.3d at 759-61 ("In determining whether an agent had actual authority to act for his principal, courts examine only the principal's words and conduct relative to the agent, and do not consider the representations made by the agent to the third party…. In determining whether apparent authority exists, we look only to the conduct of the principal leading a third party to believe the agent has authority …."); *Protect Envtl. Servs.*, 403 S.W.3d at 540 ("Actual and apparent authority are both created through conduct of the principal communicated either to the agent (actual authority) or to a third party (apparent authority).") (citations omitted).

Here, Defendant effectively admits that Frustaci and Chasteen lacked actual authority. According to Defendant, Legacy's "distributor agreement" authorized AMA to "locat[e] potential customers, facilitat[e] the signing-up of those customers, coordinat[e] customer education on Legacy products, provid[e] information on Legacy's insurance-verification process and billing procedures, provid[e] ongoing order support, and connect[] customers to Legacy's insurance-reimbursement team." Counterclaims ¶ 11. However, notably absent from this list is any authority to modify the standard terms of Legacy's written agreements or to bind Legacy to additional contractual obligations like a purported obligation to extend a credit for any grafts not reimbursed or under-reimbursed by Medicare, in contradiction with the integration clause.

Nor has Defendant plausibly pleaded any apparent authority either—no conduct whatsoever on Legacy's part that could reasonably induce Defendant to believe that Frustaci and Chasteen had the authority to modify Legacy's standard, written agreements or to bind Legacy to additional contract obligations.

6. **But Critically, Even Setting All the Foregoing Aside and Accepting Defendant's Version of the Agreements, Defendant Still Fails to Adequately Plead a Breach.**

Even if the Court were to ignore all the foregoing and accept, *arguendo*, Defendant's version of the contract, Defendant would still have failed to plead a breach of contract here. According to Defendant's own pleadings, the alleged promise (made by Frustaci and Chasteen on behalf of Legacy) was that Legacy "would give the customer a credit for any amounts not paid by Medicare in the event of a denial or underpayment (***unless the denial or underpayment was due to the provider's use of a product that was not medically necessary***)." Counterclaims ¶ 9 (emphasis added). But nowhere does Defendant plead that the Medicare denials and/or underpayments for which Legacy allegedly failed to extend credit even qualified for a credit (because they were not the result of Defendant's own improper use of the grafts) under its own theory of the case!

7. **For Similar Reasons, Even If Legacy's Benefit Verification Assurance Program Created Any Enforceable Contractual Obligations, FAD Has Not Pleaded a Breach of That Program Either.**

For similar reasons, Defendant's invocation of Legacy's Benefit Verification Assurance Program—a separate program that Legacy customers could optionally enroll in—fares no better. *See* Ex. B. Even assuming the Assurance Program created enforceable obligations on Legacy's part (which it did not), Defendant has not pleaded any breach of it. The Assurance Program is clear that Legacy would only credit denials "due **solely** to an error made by [Legacy's] Reimbursement Support Center in researching and summarizing whether and under what circumstances and criteria

16

(*e.g.*, prior authorization, FDA-approved use, etc.) product is covered by the patient's insurance" and "subject to" a number of additional "eligibility criteria and conditions/limitations of the Program[.]" Ex. B at App. 056 (emphasis in original).

Here, Defendant has not alleged that a single denied claim that Legacy allegedly failed to issue a credit for (a) was "due **solely** to an error made by Reimbursement Support Center" or (b) that Defendant satisfied all the other conditions precedent to be eligible for a credit—*e.g.*, that Defendant (1) "used the Reimbursement Support Center prior to use of the product on the patient," (2) "provided the Reimbursement Support Center complete and accurate patient information," (3) used the grafts in a manner "fully compliant with all of the patient's insurance and documentation criteria," (4) "notif[ied] the Reimbursement Support Center of the third-party payor's denial of coverage within six months," *etc.* Ex. B at App. 056; *see, e.g.*, *Grimm v. Grimm*, 864 S.W.2d 160, 161 (Tex. App.—Houston [14th Dist.] 1993, no pet.) ("[i]f a contract contains conditions precedent, there must be some allegation by the [claimant] that the conditions have been met.") To the contrary, the *only* thing Defendant alleged was that "Medicare denied or underpaid the corresponding claims for payment" and that "Legacy refused to provide appropriate credits." Counterclaims ¶¶ 22, 26. But that is wholly insufficient to plead a breach of the Assurance Program. Even if it was an enforceable promise, the Assurance Program, by its unambiguous terms, does not cover all denials—only a narrow subset of denials under a series of conditions. Thus, the mere fact that Legacy refused to credit some denials—without any additional allegations about the circumstances of those denials and whether they satisfy the conditions of the Assurance Program—does not mean that Legacy failed to live up to its Assurance Program.

17

**C.**      **Defendant Also Fails to Adequately Allege Fraudulent Inducement.**

**1.**      **As a Preliminary Matter, Post-Contractual Statements Are Irrelevant to Defendant's Fraudulent Inducement Counterclaim.**

Representations made *after* a contract is already executed obviously cannot have induced a party to enter into that contract. *See, e.g., New Century Financial, Inc. v. Olympic Credit Fund, Inc.*, 487 Fed. App. 912, 915 (5th Cir. 2012) (holding that representations made after execution of a contract cannot support a claim for fraudulent inducement); *see also Eagle Properties, Ltd. v. KPMG Marwick*, 912 S.W.2d 825, 827 (Tex. App.—El Paso 1995, pet. denied) (recognizing that "[a] representation made after a transaction is complete, no matter how false, cannot give rise to an action for fraud."). Thus, any representations made by Poulemanos "[o]n or about April 12, 2024" and his follow-up email "[o]n April 18, 2024"—which all occurred *after* Defendant entered into the Agreements on February 9, 2024 and April 1, 2024, respectively—are irrelevant to Defendant's fraudulent inducement claim. Counterclaims ¶¶ 13, 15-17.

**2.**      **Moreover, None of the Precontractual or Contemporaneous Writings Support Defendant's Fraudulent Inducement Counterclaim.**

Defendant's fraudulent inducement counterclaim alleges that Legacy, "through its agents," made "material false representations to FAD" to induce it into entering the Agreements, including the representation that Legacy "would verify Medicare coverage for products (as applied to specific patients) and thereafter give FAD a credit for any amounts not paid by Medicare in the event that Medicare denied coverage or underpaid for products that Legacy had verified as covered." Counterclaims ¶ 35.

However, as already explained above, none of the precontractual or contemporaneous documents that Defendant received and purports to rely on—*i.e.*, Legacy's IVRs, customer onboarding documents, and orders—contain anything that suggests that Legacy promised to "give FAD a credit for any amounts not paid by Medicare[.]" *See generally* Ex. A; *see supra* Section

II.A.; Section III.B.2. To the contrary, these documents just emphasize that there was ***no representation*** that Defendant would receive any credit for grafts not reimbursed or under-reimbursed by Medicare. *See, e.g.*, Ex. A at App. 004 (IVR with express disclaimer that "Legacy Medical offers insurance verification as an information service ***only*** …. Results of this research are not a guarantee of coverage or reimbursement in the future. Legacy Medical ***disclaims liability for payment of any claims, benefits, or costs***.") (emphasis added).

### 3. Defendant Is Left With Just the Alleged Misrepresentations by Frustaci and Chasteen, but, Again, Defendant Fails to Plead Any Basis to Hold Legacy Liable for Frustaci and Chasteen's Statements.

Because, as just explained, the post-contractual statements are irrelevant and because none of the prior/contemporaneous writings support Defendant's fraudulent inducement claim, all Defendant is left with are the alleged precontractual representations by Frustaci and Chasteen, third-party marketers that worked for AMA—not Legacy. *See* Counterclaims ¶ 9. But a principal "is generally not vicariously liable for the tort" of its independent contractors. *Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998) (citations omitted). And a principal is only vicariously liable for the misconduct of one of its agents if: " (1) an agency relationship existed …; (2) the [agent] committed the act; and (3) the act was in the course and scope of the [agent]'s authority"—whether actual or apparent. *United Residential Props., L.P. v. Theis*, 378 S.W.3d 552, 563-64 (Tex. App.—Houston [14th Dist.] 2012, pet denied.). And here, Defendant pleads nothing plausibly showing that Frustaci and Chasteen were anything other than independent contractors, as opposed to agents of Legacy. And even if they were agents of Legacy, as already explained, Defendant fails to plead facts plausibly showing that Frustaci and Chasteen had the actual or apparent authority to bind Legacy to purported additions and modifications to Legacy's form written integrated contracts. *See supra* Section III.B.5.

Perhaps recognizing this deficiency, Defendant pleads instead that "Legacy ratified the statements and conduct of those individuals or benefited from the statements and conduct and had knowledge of them." Counterclaims ¶ 34. But ratification under Texas law requires that the principal have full knowledge of all material facts relating to an agent's alleged unauthorized act, and then either expressly ratify that act or engage in conduct inconsistent with intent to disavow it. *See Land Title Co. of Dallas v. F. M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex. 1980). Here, Defendant pleads no facts showing that Legacy had knowledge of any representations, let alone that Legacy took action to approve or adopt those representations. The conclusory allegation that "Legacy benefited from the statements and conduct and had knowledge of them" is wholly devoid of supporting facts. Defendant does not identify what Legacy knew, did, or did not do in response to any alleged misrepresentations.

### 4.      In Any Case, Defendant Fails to Plausibly Plead Any False Statements.

Again, Defendant alleges that Legacy, "through its agents," represented that it would "give FAD a credit for any amounts not paid by Medicare in the event that Medicare denied coverage or underpaid for products that Legacy had verified as covered." Counterclaims ¶ 35. And, according to Defendant, this was false because "[a]t the time Legacy made its contractual promises to FAD, it had no intention of performing them." *Id.* ¶ 37. However, there are at least two fatal problems with this claim of falsity.

First, a conclusory allegation that a "[d]efendant's representations were fraudulent because Defendant never intended . . . to honor its promises" is "not sufficient to plead a claim of fraud . . . with the particularity that Rule 9(b) requires." *Miller v. CitiMortgage*, 970 F. Supp. 2d 568, 583 (N.D. Tex. 2013); *see also* Fed. R. Civ. P. 9(b). But that is all that Defendant offers here.

But more importantly, as already explained, the specific pre-contract representation that Frustaci and Chasteen made here was that Legacy "would give the customer a credit for any

20

amounts not paid by Medicare in the event of a denial or underpayment (***unless the denial or underpayment was due to the provider's use of a product that was not medically necessary***)." Counterclaims ¶ 9 (emphasis added). And again, Defendant never alleges whether any denial or underpayment that Legacy allegedly failed to give a credit for was ***not*** due to Defendant's own "use of a product that was not medically necessary." Consequently, Defendant does not even plead that Legacy failed to honor its contractual promises—let alone that it never intended to honor its contractual promises.

> **5.** **Defendant's Fraudulent Inducement Claim Also Fails Because It May Not Justifiably Rely on Alleged Representations That Are Contrary to the Unambiguous Terms of The Agreements.**

Fraud requires not only a material misrepresentation but also actual and justifiable reliance on the alleged misrepresentation. *See, e.g.*, *Marshall v. MarOpCo., Inc.*, 714 S.W.3d 724, 753 (Tex. App.—Houston [14th Dist.] 2025, no pet.) (citing *JPMorgan*, 546 S.W.3d at 653). Justifiable reliance "can be negated as a matter of law when circumstances exist under which reliance cannot be justified." *JPMorgan*, 546 S.W.3d at 654. Notably, one of those circumstances is when the alleged oral misrepresentations conflict with what the parties' actual contract says: "[R]eliance upon an oral representation that is directly contradicted by the express unambiguous terms of a written agreement between the parties is not justified as a matter of law." *Roxo Energy Co. v. Baxsto, LLC*, 713 S.W.3d 404, 409 (Tex. 2025) (quoting *JPMorgan*, 546 S.W.3d at 658); *see, e.g.*, *JPMorgan*, 546 S.W.3d at 658 ("[A]s Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms."). "A contract sufficiently contradicts an extra-contractual representation if the meaning of the contract conflicts with the earlier representation such that a reasonable person could not read the agreement and still plausibly claim to believe the earlier representation." *Roxo*, 713 S.W.3d at 409 (quoting *Barrow-Shaver*, 590 S.W.3d at 498; alterations and quotation marks omitted). This

21

rule is based on the principle that:

> [A] party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests …. If written contracts are to serve a purpose under the law, relative to oral agreements, it is to provide greater certainty regarding what the terms of the transaction are and that those terms will be binding, thereby lessening the potential for error, misfortune, and dispute…. [A] party who enters into a written contract while relying on a contrary oral agreement does so at its peril ….

*JPMorgan*, 546 S.W.3d at 658 (quoting *DRC Parts*, 112 S.W.3d at 858-59; alterations in original).

Thus, for example, in *Roxo Energy Co. v. Baxsto, LLC*, the Texas Supreme Court held that there was no justifiable reliance as a matter of law on an "oral promise to drill on and develop" certain leased land (as opposed to "flipping" the lease), where "the lease contain[ed] a typical assignment provision, which allows 'the interest of either Lessor or Lessee hereunder to be assigned, devised, or otherwise transferred in whole or in part[.]'" 713 S.W.3d at 409. As the Supreme Court further reasoned,

> The kinds of obligations to which Baxsto claims Roxo orally bound itself are addressed, often in multiple ways, by nearly every oil and gas lease, including this one. An obligation not to transfer the lease can of course be written into the lease, and Baxsto could have refused to agree in writing to a transfer clause at odds with Roxo's oral promises. It did not. Baxsto also could have insisted on a habendum clause imposing a timely drilling obligation on Roxo. It did not…. Thus, in many ways, the lease Baxsto signed is inconsistent with the oral deal it claims to have made. Having signed such an agreement, Baxsto cannot now hold Roxo to whatever version of the deal the parties may have previously discussed orally.

*Id.* at 410 (citations omitted).

And so, it is here. Defendant alleges that Frustaci and Chasteen represented that Legacy would credit Defendant for any amounts not paid by Medicare in the event of a denial or underpayment. But even assuming those representations were made, any reliance on them would not be justifiable as a matter of law because they directly conflict with the specific payment terms of the written Agreements that Defendant executed. As already explained, the Agreements contain absolutely nothing to suggest that Legacy would give Defendant a credit if Medicare denied or

underpaid a claim. Quite to the contrary, the Agreements' express integration and no-oral-modification clause makes clear that no other contract terms apply other than those expressly set forth: "This Agreement contains the entire agreement between the Parties concerning the subject matter hereof… This agreement may be amended or modified only by a written agreement signed by both parties." Agreements ¶ 7. And the Agreements' payment terms further make clear that payment for the products would be due within sixty days after product shipment with no prior conditions whatsoever, let alone any conditions tied to Medicare reimbursement. *Id.* at ¶ 6.

If all of this was still insufficient, the supplemental documents Defendant received further emphasized that there was *no* promise of reimbursement by Medicare or promise that Legacy would extend a credit if there was no Medicare reimbursement or under-reimbursement. Again, notably, the very Insurance Verification Request forms that Defendant relies on included a clear, express disclaimer that: "Legacy Medical offers insurance verification as an information service only…. ***Results of this research are not a guarantee of coverage or reimbursement in the future. Legacy Medical disclaims liability for payment of any claims, benefits, or costs***," *see* IVR form, Ex. A at App. 004. (emphasis added).

There is simply no way that a "reasonable person could" read the Agreements—which not only fail to contain any of the representations Chasteen and Frustaci allegedly made about credit for any grafts not reimbursed or under-reimbursed, but also expressly disclaim any other promises not otherwise set forth in the agreement—"and still plausibly claim to believe the earlier representation[s]" allegedly made by Chasteen and Frustaci. *Roxo*, 713 S.W.3d at 409; *see, e.g.*, *JPMorgan*, 546 S.W.3d at 658 ("[a]s Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous

terms."). Consequently, there is no justifiable reliance, as a matter of law, here and no viable fraudulent inducement claim.

### 6.    Defendant's Fraud Claims Are Also Barred by the Statute of Frauds.

The Statute of Frauds not only bars enforcement of any purported oral contract for the sale of goods for the price of $500 or more, see supra Section III.B.4—it also bars any "fraud claim to the extent [it] seeks to recover the benefit of the unenforceable bargain[.]" *Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001). "The Statute exists to prevent fraud and perjury in certain kinds of transactions by requiring agreements to be set out in a writing signed by the parties. But that purpose is frustrated and the Statute easily circumvented if a party can use a fraud claim essentially to enforce a contract the Statute makes unenforceable." *Id.*

Here, Defendant's fraudulent inducement claim is based on the same oral representations and the same alleged "contractual promise" as its breach of contract claims—*i.e.*, that Legacy would give Defendant a credit if any grafts it used were not reimbursed or under-reimbursed by Medicare. *Compare* Counterclaims ¶¶ 26-29 *with* ¶¶ 35-41. And unsurprisingly, they seek the exact same "benefit of the unenforceable bargain," *Haase*, 62 S.W.3d at 799—*i.e.*, "the charges on products for which Medicare did not provide reimbursement and other costs FAD incurred in reliance on Legacy's assurances of credits," Counterclaims ¶¶ 29, 41. These damages—"premised on the assertion" that Legacy should have honored the terms of the alleged oral promise made by Frustaci and Chasteen to extend a credit for grafts not reimbursed or under-reimbursed by Medicare—are precisely the type of expectancy damages the Statute of Frauds bars (even in the context of a fraud claim) "because they are premised on the assertion that [the party] is liable for not … honoring an alleged contract." *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 637 (Tex. 2007) (dismissing fraud claims based on breach of alleged oral employment agreement because they sought benefit-of-the-bargain damages, including "the inability to obtain employment during

the 1996-97 season, (2) the lost opportunity to advance career … (3) the lost revenues from a 1996 summer volleyball camp … and (4) loss of tuition benefits); *Ghosh v. Grover*, 412 S.W.3d 749, 757 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Accordingly, Defendant's fraud claims should also be dismissed as barred by the Statute of Frauds.

## IV.     CONCLUSION

For these reasons, the Court should grant Plaintiff's Motion to Dismiss Defendant's Counterclaims.

Dated: March 31, 2026.

**BLANK ROME LLP**

*/s/ Megan A. Altobelli*
Gregory J. Moore
Texas Bar No. 24055999
Audrey F. Momanaee
Texas Bar No. 24055993
Fed Bar No. 724132
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 632-8613
Gregory.Moore@BlankRome.com
Audrey.Momanaee@BlankRome.com

Megan A. Altobelli (local counsel)
Texas Bar No. 24107116
200 Crescent Court, Suite 1000
Dallas, Texas 75201
(972) 850-1467 M. Altobelli Direct
Megan.Altobelli@BlankRome.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on all parties and counsel of record through the Court's CM/ECF filing system on this 31st day of March 2026, in accordance with Fed. R. Civ. P. 5(b)(2).

*/s/ Megan A. Altobelli*
Megan A. Altobelli

25